# Richmond

## H. W. Brown and Charles Zigenfuss, Trading as H. W. Brown & Company v. James Wallace.

November 19, 1945.

Record No. 2958.

Present, All the Justices.

572

The opinion states the case.

*Preston P. Taylor,* for the plaintiffs in error.

*Tom E. Gilman* and *Fred E. Martin,* for the defendant in error.

Spratley, J., delivered the opinion of the court.

James Wallace instituted this proceeding against H. W. Brown and Charles Zigenfuss, trading as H. W. Brown & Company, to recover damages for injuries sustained by him as a result of a collision between a motor bus operated by him and a tractor-trailer truck owned and operated by the defendants, and driven at the time by their employee, Harry Lawrence. The defendants filed a plea of not guilty. They moved to strike the plaintiff's evidence at its conclusion, on the ground that his own testimony disclosed his contributory negligence as a matter of law. The motion was overruled, and the jury, after hearing all of the evidence, returned a verdict in favor of Wallace for $15,000. The verdict was approved by the trial judge and judgment entered thereon.

The defendants contend that the verdict was contrary to the law and the evidence; that the court erred in granting and refusing certain instructions; that the misconduct of three jurors during the trial and the improper argument of plaintiff's counsel justified a mistrial; and that the damages awarded were excessive.

The major portions of the brief and the argument of the defendants are devoted to their contention that the evidence shows that the plaintiff was guilty of contributory negligence as a matter of law.

It is conceded that the jury's verdict has established the

negligence of the defendants' driver. Since it is further true that the verdict has settled all conflicts of the evidence in favor of the plaintiff, it will be necessary to set out only so much of it as is favorable to the plaintiff and so much as may be required to consider defendants' remaining assignments of error.

The collision occurred September 22, 1943, between 4:15 and 4:30 P. M., at the intersection of U. S. Highways 13 and 17, in Norfolk county, Virginia. The weather was clear and the roads were dry. Each highway is hard surfaced. Route 13 runs approximately east and west and has an overall width of about 60 feet with a 20 foot strip of ground separating the east and west lanes of travel. There are no trees, shrubbery or structures on this strip to obstruct the vision. Route 17 runs approximately north and south and has an overall width of 43 feet, which widens somewhat as it approaches the south side of Route 13. There is a narrow concrete safety isle in its middle, 150 feet long, separating the north and south lanes of travel immediately south of Route 13. The roads do not intersect at true right angles. The map or diagram on the opposite page shows the scene of the accident and the location of the traffic lights.

Four sets of automatic traffic lights, operated by two light devices, one within the area where Route 17 crosses the east bound lane of Route 13 and the other within the area where 17 crosses the west bound lane of 13, control the flow of traffic in the lanes of travel north, south, east and west. Each device is equipped with red, amber and green lights. At a distance of between 154 and 160 feet from each of these four sets of lights there is, in each lane of travel, a metal strip, a light trip, laid across the roadway. A vehicle passing over the trip actuates the lights causing them to work as ordinary traffic lights. When red shows up facing traffic of Route 17 green should show for traffic on Route 13; and *vice versa*, when 13 had a red light a green light was due on 17. Green is a "go" light, red a "stop"

light, and amber a "caution" light which indicates that the red light is about to come on.

The intersection is wide open and clear to approaching travelers. There is a gas station with a number of pumps in

front of it, located in its south-eastern angle. The station building is 55 feet from the south side of Route 13, and approximately the same distance from the eastern side of Route 17. The pumps are 28 feet from the south side of

Route 13. The station and the pumps, however, offer but a momentary obstruction to the view of travelers approaching the intersection bound north on 17 or west on 13. At a point on Route 17, 100 feet south of the southern line of Route 13 vision is unobstructed for at least four hundred and ten feet to the east of the eastern line of 17 where it crosses. In reverse, one traveling west on Route 13 has an unobstructed view of Route 17 for a distance of four hundred and ten feet south of its intersection with Route 13.

At the time of the accident the traffic lights were not working properly. It appears that this condition had existed for three or four days prior thereto. The lights controlling northbound traffic on Route 17 would go from red to blank, that is to no light, and then to amber and back to red, without showing the green, and those controlling westbound traffic of Route 13 would go from green to amber to blank, and then back to green, without showing the red. One witness testified that shortly after the accident the amber light was not working for westbound traffic on 13. The lights, if working properly, should have changed from green to amber to red and from red to green.

James Wallace was driving a bus with between thirty and forty passengers from Elizabeth City, N. C., to the Navy Yard at Portsmouth, Va. Running on schedule time, he was traveling north on Route 17. As he approached the intersection he slowed down and applied his brakes. His traffic light was then red. He then ran over the light trip 154 feet south of the southern line of Route 13. At that time, according to Wallace and another witness, the defendants' truck had not reached the light trip east of the intersection on the westbound lane of Route 13. Wallace proceeded towards the intersection, and when he got within fifty or fifty-five feet of the southerly line of 13 his light had changed from red to blank. This indicated to him that he had a green light and the defendants' truck a red light. He continued on his course, and when he entered the intersection, he saw the defendants' truck sixty to sixty-five feet

east of the intersection slowing up, apparently for a stop in accordance with the lights. Wallace looked momentarily to his left for eastbound traffic and when he looked forward again, he said he saw the tractor-trailer so close to him that he "couldn't see any way to avoid" a collision if he continued straight ahead. He applied his brakes and turned the bus sharply to the right to avoid being hit in the side. His effort was unavailing. The bus and the trailer came together, and he does not remember anything after that. He was taken to a hospital, where he remained partially or fully unconscious until on or about October 3, 1943, a period of eleven days.

Wallace stated that as he approached the intersection he was traveling at about fifteen miles per hour, and that at the time of the accident his bus was in second gear, his brakes in good condition and ordinarily he could have stopped within fifteen feet. There was no other traffic at that time at or near the intersection.

Defendants' driver testified that he was proceeding west on Route 13 at about thirty-five miles per hour as he approached the tripping device; that when he was east of the light trip the light was green and when within seventy-five to one hundred feet east of the intersection the light changed from green to blank; that about this time he slowed down the truck and changed gears because he was expecting the light to go red; that he did not see the bus at this time; and that he was within twenty-five to fifty feet of the intersection when he saw the bus coming, "maybe one hundred and fifty feet on Route 17". He continued on, and the front part of his tractor was in the southbound lane of Route 17 when the impact occurred.

The front of the bus hit the left rear of the trailer, the bus running under the trailer. The left rear wheels of the trailer ran up over the hood and motor of the bus, the trailer thereafter turning over on its side. Measurements after the collision showed that the tractor and the trailer stopped 130 to 150 feet from the probable point of impact.

The tractor and trailer were between 35 and 36 feet long. The trailer with its load weighed between 10 and 12 tons, and the whole equipment including the tractor 40,000 pounds.

Wallace, as a result of the accident, sustained serious and permanent injuries. His right lower jaw was fractured in several places and several teeth were knocked out; his left forearm was fractured with displacement; he had multiple bruises and lacerations of the face, body and extremities. He has a permanent facial defect; deformity of the lower jaw and approximately sixty percent deafness in the right ear; a deformity of the left forearm representing a fifty percent permanent disability, and his physician said that by reason of a severe brain concussion he was unable to say definitely what the future held for him. He lost weight from 135 to 95 pounds; his hospital and X-Ray bills were $824, and his doctors' bills $450.

The following testimony of Lawrence, the defendants' driver, fully discloses his negligence:

"Q. Do you remember seeing any sign on the road before you got to the intersection?

"A. Yes.

"Q. What was the sign?

"A. Caution light.

"Q. What did you do after passing the sign?

"A. I slowed up.

"Q. Why?

"A. Because the light was green and I was expecting it to go red and I slowed down naturally. With the heavy load on I went to fourth speed because it *give* more pulling power. If I had kept on in the same gear I would not have had the same pulling power, in high gear.

"Q. After you saw the light go from green to blank, what did you do?

"A. I figured it was a light that worked automatically and that it goes out when there is no traffic coming in the opposite direction.

"Q. How far were you from the light when it went from green to blank?

"A. I would say about a hundred feet. I was inside the trip.

"Q. What?

"A. Between seventy-five and a hundred foot from the intersection.

"Q. How far would you say the truck was away from the intersection at that time?

"A. The truck?

"Q. The bus?

"A. I didn't see the bus at that time.

"Q. You didn't see the bus at that time?

"A. I didn't see the bus.

"Q. How far were you away when you first saw the bus?

"A. Twenty-five foot, or fifty foot from the intersection.

"Q. How far was the bus from the intersection at that time?

"A. I would say 150 foot."

Lawrence also testified that as he approached the intersection he was traveling about 35 miles an hour, and his co-driver accompanying him told him he ought "to hold down a little bit" and give other trucks in his convoy a chance to catch up with them. He said: "At that time I was maybe—I can't say for sure, but I was east of the trip that trips the light, but just how many feet I could not exactly say, but I was east of it and the light was green, and I slowed down a little bit more. I slowed down, reduced from high speed, which *it* is an overdrive in the truck, in another gear, and I proceeded to the intersection and about twenty-five or fifty feet I looked at the intersection and it had me a little confused. I have driven all over the country in different States. The light changed from green to blank. There *is* lights that when you hit the trip and there is no traffic approaching from the other direction it will go out. As I came in twenty-five or fifty feet of the intersection I *seen* the bus coming maybe 150 feet on Route

17. It was too late for me to stop, which I never did have a chance, and the bus kept coming across and hit me as I was crossing the intersection, * * * ". In answer to the question: "Who entered the intersection first"? he replied "I did". ·

Thus Lawrence, although he had observed the light change from a "go" signal, when he was 75 to 100 feet from the intersection, nevertheless drove into it. He admits that he was "confused", and that he assumed, or "figured", that when the green, the "go" sign for him, had changed to blank that it was a "type of light other than the usual red one" and indicated he had a clear road. At this time and at the stated distance from the light, he didn't see the bus, which he could or should have seen if he had kept a proper lookout.

If he didn't see the bus he couldn't know when it entered the intersection. If, as a matter of fact, the bus had been 150 feet south of the intersection when the truck was only 25 to 50 feet from the eastern intersection the bus must have traveled at least 3 or 4 times as fast as the truck, which had merely slowed down from a speed of 35 miles per hour. The distance at which the tractor-trailer was found from the point of impact, after the collision, gives some indication of its speed.

We will look next at the position occupied by Wallace. Wallace knew that the lights regulating northbound traffic on 17 had not been working properly for 4 or 5 days, but he did not know that they were out of order on 13. He knew that when the red light on Route 17 changed, green was supposed to come on for all traffic on Route 17, and a red light should show for both lanes of traffic on Route 13. Entering the south side of the intersection he observed the tractor-trailer slowing down 60 to 65 feet from the eastern intersection. He was in the intersection first and assumed that the truck driver would observe both the rule of the right of way and the traffic lights. When he discovered his peril he applied his brakes and turned to the right to avoid being struck in the side of the bus.

One may not wantonly thrust himself into a dangerous situation, no matter how careless the other party may be. While he may presume that cars approaching an intersecting highway will be operated carefully and lawfully, he must maintain a reasonable lookout in each direction. When he realizes that the actions of another have created a dangerous situation it is his duty to avoid the consequences of that situation as far as possible, but no more is expected of him than of a reasonable man under similar circumstances.

As Mr. Justice Holt said in *Otey* v. *Blessing*, 170 Va. 542, 197 S. E. 409:

"A defendant precipitated into an unexpected situation may not make the wisest choice. He is only required to do what a person of ordinary prudence should have done, and whether he uses reasonable care under the circumstances is ordinarily a question for the jury". *Lavenstein* v. *Maile*, 146 Va. 789, 132 S. E. 844.

Here the bus entered the intersection ahead of the truck. The driver of the truck had every opportunity to see and observe the oncoming bus, but failed to do so. He, Lawrence, drove into the intersection, although his right to proceed was denied both by the change of the traffic light from green and by the advancing bus. The slowing down of his truck indicated something. His admitted "confusion", created by the unusual shift of the light, showed his indecision in conforming to the requirements of the situation.

Was the action of Wallace such as might have been expected of a person of ordinary prudence under a like situation? The mere fact that he failed to avoid the collision does not charge him with negligence simply because another person might have acted differently and more judiciously. Whether Wallace was justified in proceeding through the intersection when he saw the truck slowing down 60 to 65 feet from the intersection; whether he was negligent in failing to keep his eyes on it continuously thereafter; and whether he was justified in assuming that the change in the lights in his favor, and the slowing up of the

truck invited him to proceed because he was first in the intersection were questions for the jury.

The defendants rely upon a line of cases involving the collision of two automobiles approaching each other at right angles on level ground, traveling under perfect control, in clear daylight, in plain sight of each other, and with no intervening traffic, wherein we have held that these peculiar facts, *without more*, disclosed concurring negligence on the part of both drivers. In that connection we said: "If, without more, two automobiles, traveling upon intersecting highways, were to run into each other at the point of intersection, plainly there could be no recovery by either driver. The rights of each would have been equal and their negligence the same. The chance which each had to avoid the accident was common to both. * * * ". *Virginia Elec., etc., Co. v. Vellines,* 162 Va. 671, 175 S. E. 35; *Remine v. Whited,* 180 Va. 1, 21 S. E. (2d) 743, and cases cited.

The facts in the cases relied on by the defendants may be readily distinguished from those here. The incidents which we have recited in this case take it out of the stated rule.

■ There is no merit in the assignments of error relating to Instructions Nos. 2 and 3. They merely stated the statutory requirements applying to drivers of all motor vehicles. Under the peculiar circumstances of this case the jury had the right to consider whether speed, lack of control or failure to keep a proper lookout on the part of the driver of the defendants' vehicle were negligent factors contributing to the collision.

Defendants requested the court to give the following instruction: "The court instructs the jury that since the traffic light at this intersection was not working properly this condition put plaintiff on notice that others using the intersecting road might be confused by the traffic light and placed upon him the duty to exercise *a higher degree of care than if the lights were working properly*".

■ The court gave the instruction after it substituted for the italicized words the following language: "that degree of care commensurate with the conditions then and there

existing". With this amendment the instruction was identical with Instruction No. 6 already given at the request of the plaintiff without objection from the defendants. The plaintiff knew nothing about the condition of the lights regulating traffic going west on Route 13. Under the circumstances, we do not think the court erred.

It is contended that the court erred in refusing to grant Instruction No. 4, reading as follows: "The Court instructs the jury that the word 'intersection' as used in this instruction means the area within the prolongation of the lateral lines of the westbound lane of Route 13 and a prolongation of the lateral lines of the northbound lane of Route 17, where the latter join or cross the former, or, in other words, in determining which vehicle reached the intersection first you are to use the eastern line of the northbound lane of traffic of Route 17 and the southern line of the westbound lane of traffic on Route 13 and you are further instructed that, since the traffic light at this intersection was not working properly, if defendants' truck reached or entered the intersection first or approximately the same time as plaintiff's bus reached or entered the intersection, then the defendants' truck had the right of way over the plaintiff and it was the duty of the plaintiff to yield this right of way to the defendants' driver and if the plaintiff failed to so yield the right of way and such failure helped to bring about the accident then you must find for the defendants".

The purpose of this instruction was to tell the jury that the intersection began for the plaintiff when he reached the southern line of the western lane of travel of Route 13, and the intersection for the defendants' driver began when he reached the eastern line of the north lane of travel of Route 17. In effect, the defendants assert that there were two separate intersections, because one of the intersecting highways consisted of two driveways, one on each side of a "central parkway," and the paths of the two vehicles could not cross each other except in the area where the northern lane of travel of Route 17 crossed the western lane of travel of Route 13.

This contention is controlled by Virginia Code, 1942 (Michie), section 2154 (49), (z), which reads as follows:

" 'Intersection.'—The area embraced within the prolongation of the lateral curb lines, or if none, then the lateral boundary lines of two or more highways, which join one another at an angle, whether or not one such highway crosses the other."

The statute fully covers the two highways which here crossed each other. It also applies where three or more highways cross or join one another at an angle. The intersection of these two highways embraced the traveling space common to both highways, that is, the rectangular space formed by continuing, in this case, the lateral boundary lines of Route 17 into and across Route 13.

The so-called "central parkway" in Route 13 was nothing more than an isle of neutral ground separating two lanes of traffic. Its width was less than the length of many motor vehicles. The tractor-trailer was 35 to 36 feet long, and the passenger capacity of the bus indicated its length. A 25 or 30 foot motor vehicle entering the southern line of the westbound lane of Route 13 would still have a portion of its rear exposed to traffic in the eastbound lane of Route 13.

The two traffic light devices or lamps operated as a unit. The four sets of lights controlled the crossing of the two highways as one intersection, directing traffic to stop or proceed as it approached the exterior lateral boundary lines of the highway to be crossed. There were no additional lights guarding the interior lateral lines of the separate lanes of travel on each highway.

There is no merit in assignments of error Nos. 7 and 8, relating to improper argument of counsel, and to the misconduct of members of the jury. The first of these alleged errors was not assigned as a ground to support the motion for a new trial. Evidence taken by the court made it clear that the jurors were not influenced by the fact that three of their members, on their way home one night during the trial, drove by the intersection to see how the "light trip"

worked. It was disclosed that the three jurors had not discussed the matter in the jury room and they stated positively that their inspection had not influenced their decision in the case.

The trial court granted six instructions at the request of the plaintiff and six at the request of the defendants. The theory of the defendants was covered from every possible angle. Instruction No. 3, granted at their request, presented squarely to the jury the issue whether the plaintiff acted as a reasonable prudent man would have acted under the circumstances then prevailing. It reads as follows:

"The Court instructs the jury that even though you might believe from the evidence in this case that the plaintiff had the right of way over the defendants' driver, you are further instructed that if it appeared to the plaintiff, or by the exercise of reasonable care it should have appeared to him, that defendants' driver did not intend to yield that right of way it was the duty of the plaintiff to make reasonable effort to slow up his bus or turn it away in an effort to avoid the collision which ensued and if you believe from the evidence that the plaintiff failed in this duty then you must find for the defendants".

It is finally contended that the verdict is excessive. The plaintiff was gravely hurt. He was permanently injured and scarred, and his earning ability has been greatly diminished.

We have repeatedly held that within wide limits it is for the jury to say what is just compensation. Unless it is shown that their verdict was actuated by prejudice or partiality on their part, that it shocks the conscience, it cannot be set aside. Vol. 3, Digest of Va. and West Va. Reports (Michie), Damages, sections 46-70, and numerous cases cited.

Upon a full and careful consideration of all the evidence, we think it is sufficient to support the conclusion of the jury that the negligence of defendants' driver was the sole proximate cause of the injuries of the plaintiff. The judgment must, therefore, be affirmed.

*Affirmed.*